1  **BISNAR | CHASE LLP**
   BRIAN D. CHASE (164109)
2  bchase@bisnarchase.com
   JERUSALEM F. BELIGAN (211258)
3  jbeligan@bisnarchase.com
   1301 Dove Street, Suite 120
4  Newport Beach, CA 92626
   Telephone: 949/752-2999
5  Facsimile: 949/752-2777

6  **JOSE GARAY, APLC**
   JOSE GARAY (200494)
7  jgaray@garaylaw.com
   9861 Irvine Center Drive
8  Irvine, CA 92618
   Telephone: 949/208-3400
9  Facsimile: 949/713-0432

10  Attorneys for Plaintiff and Putative Class

11

12              **UNITED STATES DISTRICT COURT**

13  **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

14  JENNIFER COX, individually, on          Case No.
15  behalf herself and all aggrieved
    consumers similarly situated,           **Class Action**
16
17              Plaintiff,                  **COMPLAINT FOR VIOLATIONS
                                            OF: (1) CALIFORNIA'S
18         vs.                              CONSUMERS LEGAL REMEDIES
                                            ACT; (2) CALIFORNIA'S UNFAIR
                                            COMPETITION LAW; (3)
19  Cuttwood, LLC; Molecule Labs, Inc.;     CALIFORNIA'S DECEPTIVE,
    Jared Unger; Michael Guasch; Art        FALSE AND MISLEADING
20  Chambers; William Ruiz; and DOES 1      ADVERTISING LAW; AND (4)
    to 10inclusive,                         BREACH OF EXPRESS
21                                          WARRANTY
22              Defendants.                 **DEMAND FOR JURY TRIAL**

23      Plaintiff Jennifer Cox ("Plaintiff"), by and through her undersigned attorneys,

24  bring this action on behalf of herself and all others similarly situated, based upon

25  personal knowledge as to herself and her activities, and on information and belief as

26  to all other matters, against defendants, Cuttwood, LLC; Molecule Labs, Inc.; Jared

27  Unger; Michael Guasch; Art Chambers; and William Ruiz (Collectively known as

28

                                    1

"CUTTWOOD" or "Defendants"), and alleges as follows:

## JURISDICTION AND VENUE

1.  Diversity subject matter jurisdiction exists over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

2.  While the exact number of members in each of the proposed class is unknown at this time, Plaintiff has reason to believe that thousands of consumers purchased Defendants' vapor liquids ("e-liquids") for electronic cigarettes (or "e-liquids")[1] throughout California during the relevant period. The number of class members could be discerned from the records maintained by Defendant.

3.  While the exact damages to Plaintiff and the members of the class are unknown at this time, Plaintiff reasonably believes that their claims exceed five million dollars ($5,000,000) in the aggregate.

4.  This Court has personal jurisdiction over CUTTWOOD because CUTTWOOD has purposefully availed itself of the privilege of conducting business in California by advertising and selling its brand of e-liquids also known as "vape juices" to retailers and consumers in California. Upon information and belief, CUTTWOOD and its agents have prepared, disseminated, or made available print advertisements, Internet advertisements and related materials through its website,[2]

---

[1] E-liquids are sometimes used in devices called personal vaporizers, which are products that include, but are not synonymous to, electronic cigarettes.

[2] CUTTWOOD's website is located and can be viewed at http://www.cuttwood.com/.

CLASS ACTION COMPLAINT

all of which are at issue here, in California. On information and belief, CUTTWOOD promotes sales of its e-liquid to consumers in various retail outlets. CUTTWOOD is incorporated in the State of California and its corporate headquarters is located at 17750 Crusader Avenue, Cerritos, California 90703.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District and because Defendants:

   a. have intentionally availed itself to the laws and markets within this District through the promotion, marketing, distribution and sale of its products in this District;

   b. does substantial business in this District; and

   c. is subject to personal jurisdiction in this District.

## NATURE OF THE ACTION

6.     Defendants, the manufacturer, seller, and distributor of the CUTTWOOD brand of juices (collectively, "CUTTWOOD E-Juices") have a uniform and long-standing pattern of employing unfair and deceptive practices with respect to the sale of its products through material misrepresentations and omissions concerning the health, safety, and quality of its products.

7.     Defendant CUTTWOOD is a manufacturer of e-liquids, which are used in electronic cigarettes. Defendant CUTTWOOD's e-liquids contain hazardous substances known as diacetyl ("DA") and acetyl propionyl ("AP") (also known as 2,3-pentanedione), in addition to propylene glycol, glycerin, nicotine, and flavorings. As detailed herein, the DA and AP levels detected for certain particular flavors of Defendants' e-liquids represent the highest concentration that has ever been seen in any e-liquid. Some e-liquids manufactured by other companies are

CLASS ACTION COMPLAINT

1  sold *without* DA and AP, propylene glycol, nicotine, or flavors, as it is possible to
2  source ingredients that do not contain these toxic ingredients.[3]

3      8.    DA and AP are compounds of diketone and are responsible for the
4  buttery and creamy taste of many foods and beverages, most famously, popcorn.
5  While DA and AP are safe to eat or drink, inhalation is known to cause certain lung
6  conditions, including Bronchiolitis Obliterans, a condition in which irreversible
7  scarring to the lungs is produced, in serious cases requiring lung-transplants.  A
8  number of cases of Bronchiolitis Obliterans in popcorn factory workers exposed to
9  DA and/or AP led authorities to create very strict limits on the amount of these
10 chemicals that workers may be exposed to.    Similar cases of Bronchiolitis
11 Obliterans have since been discovered in workers in other types of manufacturing
12 plants.

13     9.    It is also known that DA and/or AP are contributing factors to both
14 chronic obstructive pulmonary disease ("COPD") and emphysema.[4]

15     10.   Defendants do not warn its customers about the dangers of inhaling DA
16 and AP, neither on its product packaging nor on its website.  Instead, Defendants'
17 marketing campaign describes its e-liquids as if it were selling wine.  For example,
18 the Company describes its "Unicorn Milk" e-liquid as "a perfect blend of enhanced
19 strawberry extract and four unique fresh creams," while its "Boss Reserve" e-liquid
20 as "a golden honey graham cereal with roasted nut clusters.  Drenched in creamy
21 milk & layered with sliced bananas."

22     11.   Despite Defendants' marketing campaign that boasts it "prides itself on
23 providing quality made products, through research, development, rigorous testing,

---

[3] For example, Virgin Vapor, Halo Cigs, Fireband, and Mt. Baker Vapor all produce
e-liquids that are DA and AP free.
[4] S. Costigan, C. Meredith, *An Approach To Ingredient Screening And Toxicological
Risk Assessment of Flavours in E-liquids*, 72 REG. TOX. AND PHARM. 361 (July
2015).

CLASS ACTION COMPLAINT

and innovation" "with only approved high quality ingredients and the best flavors in the world," Defendants' products are actually laden with harmful chemicals.

12. Sometime in 2009, users of electronic cigarettes began to become aware of the presence of DA and AP in e-liquids that those substances pose serious health hazards, particularly health hazards associated with respiratory diseases. Some e-liquid manufacturers took the issue seriously enough to make efforts to halt usage of flavorings that contain DA and/or AP in their e-liquids.

13. From the Company's inception in 2013, it has manufactured and sold high-end e-liquids in a variety of flavors, most if not all containing various amounts of DA and/or AP, depending on the flavor. A number of tests done on Defendants' e-liquids, such as the independent tests results by Enthalpy Analytical, Inc. (available on the website www.vaporshark.com/e-liquid/cuttwood/cuttwood-boss-reserve), show that Defendants' e-liquids contain detectable amounts of DA and/or AP.

14. Defendants did not disclose or acknowledge these results.

15. Defendant CUTTWOOD's e-liquids have in the past contained titanium dioxide. Titanium dioxide has recently been classified by the International Agency for Research on Cancer (IARC) as an IARC Group 2B carcinogen "possibly carcinogen to humans."

16. Defendants have employed numerous methods to convey to consumers throughout the United States their deceptive, false and misleading message about their e-liquids, including its packaging, product inserts, communications with its customers via e-mail or internet forums, and its website www.cuttwood.com (last visited November 18, 2015).

17. As a result of Defendants' deceptive, false and misleading labeling/claims in its advertising, consumers – including Plaintiff and the other members of the proposed class – have purchased Defendants' e-liquids without being advised that they contain a variety of toxins, impurities, and related potential

health hazards as found by various studies and do not have the particular standard or quality as represented in its advertising and promotional materials. Had Defendants disclosed these material facts, Plaintiff would not have purchased Defendants' CUTTWOOD E-Juice. Defendants were able to charge more than what its CUTTWOOD E-Juice would have been worth had it disclosed the truth about them.

18. CUTTWOOD's warning label is misleading and deceptive because while it identifies nicotine as a chemical component, it does not provide a full list of other carcinogenic ingredients and other disease-causing substances as discovered by Enthalpy Analytical, Inc.

19. Plaintiff brings this lawsuit against Defendants, on behalf of herself, the proposed class, and the general public, in order to: (a) halt the dissemination of Defendants' deceptive advertising message; (b) correct the false and misleading perception Defendants have created in the minds of consumers through its representations and omissions; and (c) secure redress for consumers who have purchased on or more of Defendants' e-liquids. Plaintiff, on behalf of herself and the proposed class, alleges violations of California Business & Professions Code §§ 17200, *et seq.* ("UCL"), the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* ("CLRA"), and breach of express warranty.

## PARTIES

### *Plaintiff*

20. Plaintiff is an individual who resides in Orange County, California and is a citizen of California. As a result of misleading packaging and Defendants' omissions, Plaintiff believed that CUTTWOOD's products did not carry dangers or risks like traditional cigarettes do and was a safer alternative to traditional smoking. While in the State of California, Plaintiff purchased CUTTWOOD E-Juices. Had Defendants disclosed: (1) that CUTTWOOD E-Juices contain a variety of toxins, impurities, and related potential health hazards which are or should be known to Defendants, and as found by studies discussed in more detail below; and (2) that

1  CUTTWOOD did not take any measures to test the quality and safety of their
2  products, Plaintiff would not have purchased Defendants' CUTTWOOD E-Juices.
3  Thus, as a result of Defendants' material deceptive claims and omissions, Plaintiff
4  suffered injury in fact and lost money.

5       21.    Prior to the filing of this Complaint, Plaintiff regularly purchased
6  CUTTWOOD E-Juices from Vapor Craze located at 23016 Lake Forest Drive, Suite
7  E, Laguna Hills, CA 92653; E Cig Gallery located at 24781 Alicia Parkway, Suite
8  D, Laguna Hills, CA 92653; and Elite Vapors, located at 29881 Aventura, Rancho
9  Santa Margarita, CA 92688.    Plaintiff paid the retail market price for the
10  CUTTWOOD E-Juices, which ranged between $8 to $35.

11  ***Defendants***

12       22.    CUTTWOOD is a California limited liability company with its
13  principal place of business located at, 17750 Crusader Avenue, Cerritos, CA 90703.

14       23.    MOLECULE LABS is a California corporation with its corporate
15  headquarters located at, 780 Clark Avenue Pittsburg, CA 94565.

16       24.    Launched in 2013, Defendants' products are sold in hundreds of retail
17  locations in the United State and worldwide.

18       25.    Plaintiff alleges, on information and belief, that at all times herein,
19  Defendants' agents, employees, representatives, executives, directors, partners,
20  and/or subsidiaries were acting within the course and scope of such agency,
21  employment, and representation, on behalf of Defendants.

22       26.    DOES 1 to 10, inclusive are now, and/or at all times mentioned in this
23  Complaint were licensed to do business and/or actually doing business in the State
24  of California.    Plaintiff does not know the true names or capacities, whether
25  individual, partner or corporate, of DOES 1 to 10, inclusive and for that reason,
26  DOES 1 to 10 are sued under such fictitious names pursuant to California Code of
27  Civil Procedure § 474.    Plaintiff will seek leave of court to amend this Complaint to
28  allege such names and capacities as soon as they are ascertained.

CLASS ACTION COMPLAINT

27.     Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were in some manner legally responsible for the events, happenings and circumstances alleged in this Complaint.  Defendants proximately caused Plaintiff, all others similarly situated and the general public to be subjected to the unlawful practices, wrongs, complaints, injuries, and/or damages alleged in this Complaint. Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were the agents, servants, and/or employees of some or all other Defendants, and vice-versa, and in doing the things alleged in this Complaint, Defendants are now and/or at all times mentioned in this Complaint were acting within the course and scope of that agency, servitude, and/or employment.

28.     Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were members of, and/or engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of said joint venture, partnership, and common enterprise.  Furthermore, each Defendant, may have been the alter ego and acting in the same or similar capacity as CUTTWOOD, in the treatment of Plaintiff, such that it would be unjust to provide separate legal treatment of said Defendants and DOES 1-10, who, at all relevant times, acted jointly and severally to deprive Plaintiff of her rights under California law.  Defendants, and each of them, at all times mentioned in this Complaint concurred and contributed to the various acts and omissions of each and every one of the other Defendants in proximately causing the complaints, injuries, and/or damages alleged in this Complaint.  Defendants, and each of them, at all times mentioned in this Complaint approved of, condoned and/or otherwise ratified each and every one of the acts and/or omissions alleged in this Complaint.

29.     Defendants, and each of them, at all times mentioned in this Complaint aided and abetted the acts and omissions of each and every one of the other Defendants thereby proximately causing the damages alleged in this Complaint.

# FACTUAL ALLEGATIONS

## I.   ELECTRONIC CIGARETTE JUICES

30.   This action concerns CUTTWOOD E-Juices sold by Defendant.

31.   An electronic cigarette, or e-cigarette, is a device that is an alternative to tobacco smoking. E-cigarettes are designed to deliver a smoking-like "hit" of e-liquid vapor, usually containing nicotine, which is inhaled by the user. They work through the use of a battery operated heating mechanism, which typically converts the e-liquid that may contain DA, AP, glycerin, glycol, natural and artificial flavors and, in most electronic cigarettes, various proportions of nicotine, into vapor. When a person inhales ("vapes") from an e-cigarette, this mimics the taking of a "drag" on a traditional tobacco cigarette. A heating device is activated, the e-liquid is converted into vapor, and the consumer inhales the vapor.

32.   According to a 2014 study by the Centers for Disease Control and Prevention ("CDC"), as of that year, more than one fifth of smokers in the United States had tried electronic cigarettes, and 6% of all adults had tried them. In addition, the number of calls to poison centers involving e-cigarette liquids containing nicotine rose from one per month in September 2010 to 215 per month in February 2014.[5]

---

[5]   Press Release, Centers for Disease Control and Prevention, *New study finds dramatic increase in e-cigarette related calls to poison centers* (April 3, 2014), http://www.cdc.gov/media/releases/2014/p0403-e-cigarette-poison.html (last visited July 2, 2015)

CLASS ACTION COMPLAINT




According to a subsequent study by the CDC, nearly 1.8 million middle and high school students tried e-liquids in 2011 and 2012, including approximately 160,000 students who had never used conventional cigarettes.[6] The study also found that the number of U.S. middle and high school student e-smokers doubled between 2011 and 2012.[7] By misrepresenting their product as being generally safe for human consumption and through its deceptive advertising, the youth of today feel safe smoking CUTTWOOD E-liquids and are widely unaware of the risks associated with them due to the lack of labelling and lack of public awareness on what these products really contain. CUTTWOOD and other e-liquid companies are using very similar marketing tactics as Big Tobacco companies did before the negative health effects of their products became widely known and tobacco regulations became strictly enforced. By using deceptive advertising like, "…committed to making superior products,…" or "…high quality ingredients and the best flavors in the world" (which is directly found on their website), CUTTWOOD is insinuating that its product is of high quality and generally recognized as safe when in reality their

[6] Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, *Notes from the Field: Electronic Cigarette Use Among Middle and High School Students — United States, 2011–2012* (September 6, 2013), http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6235a6.htm (last visited Jan. 7, 2014).
[7] *Id.*

CLASS ACTION COMPLAINT

long term health effects are widely unknown. However, one can reasonably infer from scientific evidence of the effects of the harmful ingredients these products contain that these products are not generally safe or healthy. By misbranding their carcinogenic liquid as a sauce, people are misled into believing that the e-liquid is healthy, as well as making their products more appealing toward teens and young people who tend to be the most allured by flavor. Flavored e-liquids have been scientifically linked to higher health risks than traditional tobacco flavorings, yet these types of e-liquids are being used most by the youth of today. It has been mandated that traditional cigarette companies be prohibited from creating flavored cigarettes so young people are not allured to try these products; however, no such restrictions have been mandated for electronic cigarettes. Consequently, CUTTWOOD and other e-liquid companies have taken advantage of this and have engineered and ramped up a large-scale marketing campaign for e-liquids and an alarming amount of kids and teenagers have been experimenting with these potentially dangerous and addictive products as a result.

33. According to analysts, sales of e-liquids in America in 2012 were between $300 million and $500 million.[8] This was approximately double what they were in the preceding year,[9] and sales have more than doubled to $1.5 billion in 2013.[10]

34. E-liquids are commonly marketed as a "safer" alternative to traditional cigarettes. However, the CDC published a report in 2014 that the number of calls to poison centers involving e-liquids containing nicotine rose from one per month in September 2010 to 215 per month in February 2014. CDC Director Tom Frieden,

[8] *See E-liquids: Vape 'Em if You Got 'Em*, The Economist, Mar. 23, 2013.
[9] *Id.*
[10] Horizon Investments, *E-liquids: Proposed Regulations Could Prove To Be A Game Changer*, Seeking Alpha, May 25, 2014.

CLASS ACTION COMPLAINT

M.D., M.P.H. commented, "This report raises another red flag about e-liquids – *the liquid nicotine used in e-liquids can be hazardous.*"[11]

35.    CUTTWOOD E-Liquid (including related paraphernalia) sells for a range of prices.  As of the filing of this Complaint, CUTTWOOD E-Liquids and related paraphernalia can also be purchased at stores throughout California.

36.    On information and belief, most members of the proposed Class have bought more than one of Defendants' E-liquids.

## II.    PUBLISHED STUDIES DEMONSTRATE THE DANGERS AND EXPOSURE TO HEALTH RISKS OF E-LIQUID JUICES

37.    Because of the rapid growth in the use of electronic cigarettes by consumers in recent years, an increasing number of government agencies and research facilities have begun to conduct studies concerning the potential health impact and risks of these devices and e-juices.  These studies have found, *inter alia*: (a) measurable amounts of carcinogens, toxins, and other contaminants in e-liquids that are, or potentially are, disease-causing, (b) harmful potential side effects of e-liquids, and (c) that more study is needed to determine the full range of health dangers of e-liquids.

38.    Recently, on April 22, 2015, an American e-cigarette and e-liquid seller called Vapor Shark hired a laboratory, Enthalpy Analytical, Inc., to conduct tests of e-liquids supplied by Defendants as well as other manufacturers for potentially dangerous chemicals.  The results showed Cuttwood, along with other brands, had detectable amounts of DA and/or AP.

39.    The National Institute for Occupational Safety and Health ("NIOSH") released a report dated August 12, 2011 stating the acceptable levels of DA and/or

---

[11] Press Release, Centers for Disease Control and Prevention, *New study finds dramatic increase in e-cigarette related calls to poison centers* (April 3, 2014), http://www.cdc.gov/media/releases/2014/p0403-e-cigarette-poison.html (last visited July 2, 2015) (emphasis added).

CLASS ACTION COMPLAINT

AP for e-liquids as 65 μg for DA and 137 μg per day for AP (1 μg = 1 millionth of a gram).[12]   The Enthalpy Analytical, Inc. test results showed that several of Cuttwood's e-liquids contained in excess of the acceptable levels of DA and/or AP.

40.   In 2009, the United States Food and Drug Administration ("FDA") conducted a study of two brands of cigarettes.[13]   The FDA tested a number of electronic cigarettes.  The FDA issued a summary of the results of that study,[14] making, *inter alia*, the statements in the following block quotes (language in brackets added):

- [the] FDA's Center for Drug Evaluation, Office of Compliance purchased two samples of electronic cigarettes and components from two leading brands.  These samples included 18 of the various flavored, nicotine, and no-nicotine cartridges offered for use with these products.  These cartridges were obtained in order to test some of the ingredients contained in them and inhaled by users of electronic cigarettes.

- FDA's Center for Drug Evaluation, Division of Pharmaceutical Analysis (DPA) analyzed the cartridges from these electronic cigarettes for nicotine content and for the presence of other tobacco constituents, some of which are known to be harmful to humans, including those that are potentially carcinogenic or mutagenic.

---

[12]  *Criteria for a Recommended Standard: Occupational Exposure to Diacetyl and 2, 3-Pentanedione,* DEPARTMENT OF HEALTH AND HUMAN SERVICES (Aug. 12, 2011) (draft), http://www.cdc.gov/niosh/docket/archive/pdfs/NIOSH-245/0245-081211-draftdocument.pdf (last visited Nov. 10, 2015).

[13]  *See* FDA Evaluation of E-liquids, DPATR-FY-09-23, available at http://www.fda.gov/downloads/drugs/scienceresearch/ucm173250.pdf (last visited Jan. 13, 2014).

[14]  http://www.fda.gov/NewsEvents/PublicHealthFocus/ucm173146.

- DPA's analysis of the electronic cigarette samples *showed that the product contained detectable levels of known carcinogens and toxic chemicals to which users could potentially be exposed.* [Emphasis added.]

- DPA's testing also suggested that *quality control processes used to manufacture these products are inconsistent or non-existent.* [Emphasis added.]

- Specifically, DPA's analysis of the electronic cigarette cartridges from the two leading brands revealed the following:

  - *Certain tobacco-specific nitrosamines which are human carcinogens were detected in half of the samples tested.*

  - *Tobacco-specific impurities suspected of being harmful to humans—anabasine, myosmine, and β-nicotyrine—were detected in a majority of the samples tested.*

  - Three different electronic cigarette cartridges with the same label were tested and each cartridge emitted a markedly different amount of nicotine with each puff. The nicotine levels per puff ranged from 26.8 to 43.2 mcg nicotine/100 mL puff.

*Id.* (Emphasis added.)

41. The FDA issued a contemporaneous consumer health brochure titled, "FDA Warns of Health Risks Posed by E-liquids,"[15] in which Margaret A. Hamburg, M.D., commissioner of food and drugs, stated, "The FDA is concerned about the safety of these products and how they are marketed to the public." The FDA also issued a safety alert[16] repeating the risks and noting that "[t]hese products

---

[15] Retrievable at http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm173401.htm.

[16] Retrievable at http://www.fda.gov/%20NewsEvents/Newsroom/

(continued...)

CLASS ACTION COMPLAINT

do not contain any health warnings comparable to FDA-approved nicotine replacement products or conventional cigarettes."

42.    Indeed, in the FDA's 2009 study, all four of the major tobacco-specific nitrosamines, N-nitrosonicotine (NNN), N-nitrosoanabasine (NAB), N-nitrosoanatabine (NAT) and 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone (NNK), were found in E-Cigarette cartridges.

43.    The health risks and unknowns concerning electronic cigarettes are compounded by the reality that e-cigarette users smoke differently than traditional smokers.  For example, a study of eight traditional and four electronic cigarettes found, *inter alia*, that, e-liquids "required a stronger vacuum [inhalation strength] to smoke than conventional [tobacco] brands."  Trtchounian, A., *Conventional and Electronic cigarettes (e-liquids) have different smoking characteristics*, Nic. & Tob. Res., Vol. 12, No. 9 (Sept. 2010), at 911.[17]  (Emphasis added.)  The study states, "the effects of this on human health could be adverse." *Id.* at 905.  According to researchers, as a general matter, stronger puffing has the potential for "leading to cancer in the deeper lung regions." *Lung Deposition Analyses of Inhaled Toxic Aerosols in Conventional and Less Harmful Cigarette Smoke: A Review*, International Journal of Environmental Research and Public Health, September 23, 2013.[18]

44.    Since the FDA released the results of its 2009 study and its concomitant warning concerning e-liquids generally, new studies have been emerging discussing the risks and dangers of e-liquids.  These studies have concerned a variety of brands and products, including CUTTWOOD E-liquids;

---

(…continued)
PressAnnouncements/ucm173222.htm.

[17]    Retrievable at http://edge.rit.edu/content/P12056/public/e%20cig%20vs%20conventional%20cig.pdf.

[18]    Retrievable at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3799535/ (last visited Jan. 14, 2014).

- 15 -

1     however, because e-liquids generally operate in a similar manner, and contain
2     similar primary ingredients, even those studies which are not identified below as
3     directly having reviewed CUTTWOOD products are relevant hereto.

4         45.    E-liquids are a subject of concern to major international entities.
5     According to a presentation given by the World Health Organization ("WHO") to
6     the European Parliament at a Workshop on Electronic Cigarettes on May 7, 2013,
7     "electronic cigarettes are a controversial issue for which additional studies and
8     evidence are needed." That presentation referenced recent findings from Turkey
9     that:

       *indicate that propylene glycol and tobacco specific N-nitrosamines,*
       *a powerful carcinogen, were found in the majority of samples.*
       Toxins from the e-cigarette averaged around 20% of those of a regular
       cigarette. It was also found that similarly labeled ENDS [Electronic
       Nicotine Delivery Systems] cartridges emit different amounts of
       nicotine, and a nicotine overdose may occur which can have serious
       side effects. *There are currently no studies available on safety and*
       *efficacy of long-term e-liquids use.*

18         46.    A study conducted by The National Center for Biotechnological
19     Information found that nicotine levels in END devices like CUTTWOOD's vary and
20     are often mislabeled. Thus the efficacy and consistency of nicotine yields and the
21     delivery of nicotine is not uniform in products across the brand and labels on these
22     products do not adequately reflect the actual quantity of nicotine levels found in
23     these products. As a result of these studies, this Center recommended that E-Cig
24     manufacturers like CUTTWOOD enforce greater quality standards in their products.

25         47.    Preliminary studies conducted by the California Department of Public
26     Health have also shown that smoking an electronic cigarette containing nicotine for
27     just five minutes can cause similar lung irritation, inflammation, and effect on blood

28

vessels as smoking a traditional cigarette, which poses a significant risk of heart attacks and cardiac problems.

48.     Studies conducted on mice by the Public Library of Science found that nicotine could also be delivered to humans through second hand smoke and also notes that inhalation of nicotine causes the increase in cotinine levels in the blood similar to levels caused by tobacco smoke which induced emphysema in mice.

49.     As recently as July 2013, the WHO stated that "[m]ost ENDS [Electronic Nicotine Delivery Systems] contain large concentrations of propylene glycol, which is a known irritant when inhaled," that "[t]he testing of some of these products also suggests the presence of other toxic chemicals, aside from nicotine," and that the safety of these devices "has not been scientifically demonstrated."[19]

50.     Numerous other studies have been performed by universities and other research centers, and have reported similar concerns about the potential for health risks associated with electronic cigarettes.

51.     For example, a 2013 report titled *Electronic Cigarettes – an Overview*, by the German Cancer Research Center,[20] which was based on a comprehensive review of literature in the field, found in summary as to "Product characteristics" (the following bullet pointed paragraphs are block quoted text):

- E-liquids cannot be rated as safe at the present time.
- Consumers do not have reliable information on product quality.
- Electronic cigarettes have various technical flaws (leaking cartridges, accidental intake of nicotine when replacing cartridges, possibility of unintended overdose.)

---

[19]  Retrievable at http://www.who.int/tobacco/communications/statements/ electronic_cigarettes/en/ (last visited Jan. 7, 2014).
[20]  Published in Red Series, Tobacco Prevention and Tobacco Control, Vol. 19: Electronic Cigarettes – An Overview (Heidelberg 2013), available at http:www.dkfz.de/en/presse/download/RS-Vol. 19-E-liquids-EN/pdf.

- Some manufacturers provide insufficient and partly wrong information about their liquids.

As to "Health Effects," the summary stated (the following bullet pointed paragraphs are block quoted text):

- The liquids contain ingredients that on short-term use irritate airways and may lead to allergic reactions and which may be harmful to health when inhaled repeatedly over a prolonged period of time.
- The aerosol of some liquids contains harmful substances (formaldehyde, acetaldehyde, acrolein, diethylene glycol, nickel, chromium, lead).
- The functionality of electronic cigarettes can vary considerably (aerosol production, nicotine delivery into aerosols).
- Adverse health effects for third parties exposed cannot be excluded because the use of electronic cigarettes leads to emission of fine and ultrafine inhalable liquid particles [otherwise known as volatile organic compounds (VOCs) that can travel deep into the lungs and cause severe inflammation]. These products also emit nicotine and cancer-causing substances into indoor air.

*Id.* at viii.

52.     Among the more specific risks identified in the studies reviewed in that report by the German Cancer Research Center are that, *inter alia* (the following bullet pointed paragraphs are block quoted text, the language in brackets has been added, and all internal citations are omitted):

- Electronic cigarettes do not extinguish naturally after about ten puffs like conventional cigarettes, but can be used for hundreds of puffs without a break. [For example, one CUTTWOOD cartridge is equivalent to 700-800 puffs.] When using them as intended, consumers may therefore get a dangerous amount of nicotine by

taking too many puffs, which may even result in serious symptoms of nicotine poisoning. *Id.* at 4-5.

- Not even nicotine-free liquids are necessarily harmless. Their main ingredients (propylene glycol, glycerine, flavours) have been approved for use in food, but this does not necessarily mean that they are also safe when they are repeatedly inhaled over a prolonged period of time – as they are when used in electronic cigarettes. There are currently no studies available on the effects of long-term use of e-liquids. *Id.* at 7.

- To date, only [a] few studies have been conducted on potential health risks associated with inhaling propylene glycol – as one does when using electronic cigarettes as intended. According to these studies, inhaling propylene glycol may affect airways. Short-term exposure to propylene glycol in indoor air ($309$ mg/m$^3$ for one minute) already causes irritations in the eyes, throat, and airways. Long-term exposure to propylene glycol in indoor air may raise children's risk of developing asthma. People who have frequently been exposed to theatrical fogs containing propylene glycol are more likely to suffer from respiratory, throat, and nose irritations than do unexposed people. We may therefore assume that the use of e-liquids, which involves inhaling propylene glycol vapours several times daily, may cause respiratory irritations. This applies, in particular, to individuals with impaired airways and to smokers who switch to e-liquids or use them additionally, because smokers usually already have impaired airways. *Id.*

- Glycerine is considered generally safe for oral intake and is used in food production as a humectant and as a solution carrier in flavors. However, this does not necessarily mean that it is also safe for

- 19 -

inhalation – as in e-liquids if used as intended. These concerns are not unfounded. The specialist journal Chest reports about a case study of a patient with lipoid pneumonia caused by glycerine-based oils from the aerosol of electronic cigarettes. The link appears to be clear, since symptoms disappeared when the patient stopped using electronic cigarettes. *Id.* at 7-8.

- Individual liquids were found to contain small amounts of nitrosamines. In addition, formaldehyde, acetaldehyde and acrolein were measured in the aerosol of various e-liquids, although considerably less than in cigarette smoke. Formaldehyde and acrolein were only found in glycerine-containing liquids; they probably form upon heating of glycerine. Acrolein is absorbed by the user: A decomposition product of acrolein was detected in the urine of e-liquids users, although considerably less than after smoking conventional cigarettes. In addition, nickel and chromium were detected in the aerosol, with higher levels of nickel measured than it is known to be present in cigarette smoke. The aforementioned substances have been classified by the German Research Foundation (Deutsche Forschungsge-meinschaft, DFG) and the International Agency for Research on Cancer (IARC) as carcinogenic. Since there is no safe threshold value for these substances, it cannot be excluded that using electronic cigarettes increases cancer risk, even though these substances may be present in very small amounts. *Id.*

- Data on the impact of e-cigarette use on pulmonary function are not conclusive. A study involving 30 participants reports adverse effects on pulmonary function after using an electronic cigarette for

five minutes; however, the long-term pulmonary effects of e-cigarette use are unknown at the present time. *Id.*

- There are currently no studies available on the effects of long-term use of e-liquids. *Id.* at 7.

53. Some of the many studies considered in the above-referenced Red Series review are among those discussed in more detail in the individual study references below. One such study was *Short-term Pulmonary Effects of Using an Electronic Cigarette*, published in June 2012 in Chest, the journal of the American College of Chest Physicians. That study expressly found both that electronic cigarettes had adverse health effects and the need for further research:

> ***E-liquids assessed in the context of this study were found to have immediate adverse physiologic effects after short-term use that are similar to some of the effects seen with tobacco smoking***; however, the long-term health effects of e-cigarette use are unknown but potentially adverse and worthy of further investigation. [Emphasis added.]

54. A French article published in the consumer publication *60 millions de consommatuers* on August 26, 2013, reported that e-liquids are potentially carcinogenic. It based its findings upon testing 10 different models of e-liquids.[21] It found "carcinogenic molecules in a significant amount" in the vapor produced in the products. It further determined that "[i]n three cases out of 10, for products with or without nicotine, the content of formaldehyde was as much as the levels found in some conventional cigarettes." It found acrolein, a toxic molecule emitted in quantities "that exceeded the amount found in the smoke of some cigarettes." "Potentially toxic" trace metals were also discovered in some of the models.

---

[21] Quotes in this paragraph are derived from B. McPartland, "Report: e-liquids are 'potentially carcinogenic'" an article published in *The Local*, a source for "France's News in English," on August 26, 2013, describing this study.

55. A study by scientists at the University of California Riverside, published on March 20, 2013 in the journal PLoS One, found that:

> one [unidentified] brand of e-liquids generates aerosols containing micron particles comprised of tin, silver, iron, nickel, aluminum and silicate, as well as nanoparticles containing tin, chromium and nickel, which are elements that cause respiratory distress and disease. Those metals come from the wires inside the cartridge, while silicate particles may originate from the fiber glass [*sic*] wicks.

Williams, M., *et al.*, *Metal and Silicate Particles Including Nanoparticles Are Present in Electronic Cigarette Cartomizer Fluid and Aerosol*, PLoS ONE 8(3): e57987 (2013).

56. Also, according to that study by the University of California at Riverside:

> A total of 22 elements were identified in EC [electronic cigarette] aerosol, and three of these elements (lead, nickel, and chromium) appear on the FDA's "harmful and potentially harmful chemicals" list. Lead and chromium concentrations in EC aerosols were within the range of conventional cigarettes, while nickel was about 2–100 times higher in concentration in EC aerosol than in Marlboro brand cigarettes (Table 1). Adverse health effects in the respiratory and nervous systems can be produced by many of the elements in Table 1, and many of the respiratory and ocular symptoms caused by these elements have been reported by EC users in the Health and Safety Forum on the Electronic Cigarette Forum website (http://www.e-cigarette-forum.com/forum/health-safety-e-smoking/). Although [a table reflecting this research] was constructed to emphasize the effects of the elements found in aerosol on the respiratory system, other systems, such as the cardiovascular and reproductive systems, can be

affected by most of the elements in EC aerosol. *EC consumers should be aware of the metal and silicate particles in EC aerosol and the potential health risks associated with their inhalation.*

*Id.* at 5 (emphasis added).

57. A study published on September 23, 2013 in the International Journal of Environmental Research and Public Health titled, *Lung Deposition Analyses of Inhaled Toxic Aerosols in Conventional and Less Harmful Cigarette Smoke: A Review*, found that there were potential risks associated with e-liquids that were not a factor in traditional cigarettes, including "compensatory smoking (*i.e.*, stronger puffing) leading to cancer in the deeper lung regions," and that "[u]nknown reactions between some components in newly designed filters (or other new additives) may lead to the production of carcinogens or other toxicants."

58. Most CUTTWOOD E-liquids contain nicotine. On December 15, 2013, the American Society for Cell Biology issued a press release concerning the findings of researchers at Brown University, who determined that, "Nicotine, the major addictive substance in cigarette smoke, contributes to smokers' higher risk of developing atherosclerosis, the primary cause of heart attacks," and that, as such, e-liquids, which contain nicotine, as most CUTTWOOD E-liquids do, "may not significantly reduce risk for heart disease."[22]

59. In an article published in the Contemporary Reviews in Cardiovacsular Medicine titled, *E-liquids A Scientific Review,* on May 13, 2014, the authors emphasized the importance of "assess[ing] e-cigarette toxicant exposure and ... health effects" to "protect[] the entire population—children and adults, smokers and

---

[22] American Society for Cell Biology, "Nicotine drives cell invasion that contributes to plaque formation in coronary arteries, Research indicates e-liquids may not significantly reduce risk for heart disease," Dec. 15, 2013, available at http://www.eurekalert.org/pub_releases/2013-12/asfc-ndc112613.php (last accessed Jan. 7, 2014).

CLASS ACTION COMPLAINT

nonsmokers—in the context of how the tobacco industry is marketing and promoting these products." The authors noted based on empirical studies that "[c]onsumer perceptions of the risks and benefits and decisions to use e-liquids are heavily influenced by how they are marketed." E-liquid manufacturers, like CUTTWOOD, use celebrities to market their products; claim that they are healthier, cheaper, and cleaner than traditional cigarettes; can be smoked anywhere; can be used to circumvent smoke-free policies; do not produce secondhand smoke; and claim they produce only harmless "vapor." These "[h]ealth claims and claims of efficacy for quitting smoking are unsupported by the scientific evidence to date." The authors also discussed the secondhand exposure of e-liquids (the following bullet pointed paragraphs are block quoted text, the language in brackets has been added, and all internal citations are omitted):

- E-liquids do not burn or smolder the way conventional cigarettes do, so they do not emit side-stream smoke; however, bystanders are exposed to aerosol exhaled by the user.

- [While] [t]oxins in the e-cigarette aerosol were at much lower levels compared with the conventional cigarette emissions[,] [the studies] found low levels of formaldehyde, acetaldehyde, isoprene, acetic acid, 2-butanodione, acetone, propanol, propylene glycol, and diacetin (from flavoring), traces of apple oil (3-methylbutyl-3-methylbutanoate), and nicotine (with differing levels depending on the specific protocols) emitted into the air.

- [While the toxicity level was lower in e-liquids studied,] the particle size distribution and number of particles delivered by e-liquids are similar to those of conventional cigarettes ... Smokers exhale some of these particles, which exposes bystanders to "passive vaping." Like cigarettes, e-cigarette particles are small enough to reach deep into the lungs and cross into the systemic

- 24 -

circulation. At a minimum, these studies show that e-cigarette aerosol is not merely "water vapor" as is often claimed in the marketing for these products. Tests on e-liquids show much lower levels of most toxicants, but not particles, than conventional cigarettes. The thresholds for human toxicity of potential toxicants in e-cigarette vapor are not known, and the possibility of health risks to primary users of the products and those exposed passively to their emissions must be considered.

60. Studies conducted by the Public Library of Science provided an in-depth study on additional adverse health effects that electronic cigarettes and specifically used CUTTWOOD's as a part of their research. These studies linked these END products to cellular oxidative stress and inflammation of cells exposed to aerosol emissions released by electronic cigarettes. E-liquids have been significantly linked to the production of reactive oxidative species (OX/ROS), especially in flavored cartridges like the ones sold by CUTTWOOD. These studies found that consumption of E-Cigarette aerosols increased the fluorescence intensity levels in exposed cells which have been linked to increased levels of OX/ROS. OX/ROS has been shown to cause oxidative stress within cells and produces an injurious response in bodily processes. E-cig aerosols have also affected cell viability and the high levels of fluorescent substances found in these aerosols produce an inflammatory response in human bronchial epithelial airway cells because they cause secretions of Il-8 and Il-6 which contributes to the bodily inflammatory response. This condition has been proven to be further exacerbated by nicotine consumption. When e-liquids were applied directly to lung fibroblasts there were significant signs of epithelial cell inflammation, cell stress, and other phenotypic abnormalities. Studies were conducted on mice to produce evidence of pulmonary inflammation as well by measuring their bronchoalveolar lavage fluid levels after 3 days of exposure to E-cigarette aerosols. After the exposure the Il-6

levels in mice significantly increased and the increase of this interleukin has been strongly correlated with an increase in pulmonary inflammation. Because CUTTWOOD E-liquids were specifically used among other brands for these studies, strong connections can be legitimized between smoking CUTTWOOD E-liquids and experiencing these serious health issues. CUTTWOOD's deceptive advertising techniques and lack of adequate labels on their products are deliberate and widely successful attempts to mislead consumers into believing they are consuming a generally safe and healthy product. CUTTWOOD and other major electronic cigarette companies justify these unethical business practices by using unreliable studies that are conducted by private institutions by people who have a stake in the electronic cigarette industry. This opens up the possibility of an existing bias that has a significant effect on the results and interpretations of the findings of these studies, putting the validity of the tests conducted into question. In addition to this, CUTTWOOD has not provided any evidence that it did any preliminary testing of their own products before releasing them to the market, further reducing the transparency about the quality of their END products.

61. Most recently, on May 15, 2014, the Nicotine & Tobacco Research published a study titled, *Carbonyl Compounds in Electronic Cigarette Vapors – Effects of Nicotine Solvent and Battery Output Voltage*. Although CUTTWOOD E-liquids were not one of the brands studied, the study has significant implications on CUTTWOOD E-liquids because the brands studied contained the same nicotine solvents used in CUTTWOOD E-liquids (i.e., glycerin and propylene glycol). The study performed by the Roswell Park Cancer Institute in Buffalo, NY found that (the following bullet pointed paragraphs are block quoted text):

- **Introduction:** Glycerin (VG) and propylene glycol (PG) are the most common nicotine solvents used in e-liquids (ECs). It has been shown that at high temperatures both VG and PG undergo decomposition to low molecular carbonyl compounds, including

the carcinogens: formaldehyde and acetaldehyde. The aim of the study was to evaluate how various product characteristics, including nicotine solvent and battery output voltage, affect the levels of carbonyls in EC vapor.

- **Methods:** Twelve carbonyl compounds were measured in vapors from 10 commercially available nicotine solutions and from three control solutions composed of pure glycerin, pure propylene glycol, or a mixture of both solvents (50:50). EC battery output voltage was gradually modified from 3.2 to 4.8 V. Carbonyl compounds were determined using HPLC/DAD method.

- **Results:** Formaldehyde and acetaldehyde were found in 8 of 13 samples. The amounts of formaldehyde and acetaldehyde in vapors from lower voltage EC were on average 13- and 807-fold lower than in tobacco smoke, respectively. The highest levels of carbonyls were observed in vapors generated from PG-based solutions. Increasing voltage from 3.2 to 4.8 V resulted in 4 to over 200 times increase in formaldehyde, acetaldehyde, and acetone levels. The levels of formaldehyde in vapors from high-voltage device were in the range of levels reported in tobacco smoke.

- **Conclusions:** Vapors from EC contain toxic and carcinogenic carbonyl compounds. Both solvent and battery output voltage significantly affect levels of carbonyl compounds in EC vapors. High-voltage EC may expose users to high levels of carbonyl compounds.

CLASS ACTION COMPLAINT

## III. DEFENDANTS' ADVERTISEMENTS FOR ITS CUTTWOOD E-LIQUIDS ARE PATENTLY AND MATERIALLY DECEPTIVE, AND FALSE AND MISLEADING

62.     Defendants have carried out a consistent and widespread campaign of deceptively promoting its e-liquids. The core marketing message that Defendant has used is to induce consumers to purchase its products is that its products contain quality ingredients or similar variations, and are a safer and healthier alternative to traditional cigarettes. This is false and misleading given the studies discussed above that have found DA and AP in Defendants' e-liquids and that DA and AP are found to be hazardous to one's health. It is also false and misleading given the contents of Defendants' products because there is still insufficient research for CUTTWOOD to assert or convey that their products do not pose long term health dangers as smoking traditional cigarettes does.     Moreover, based on information and belief, CUTTWOOD has not and did not put in place any measures to test the safety of its products prior to selling and distributing them to consumers and retailers.

63.     Defendants' statements and omissions have occurred in at least four forms, all of which constitute "advertising." These include: its packaging; inserts to its packaging and shipping materials (including manual); its print advertisements; and its website through which it directly sells CUTTWOOD E-liquids and related products to the public. Defendants' pervasive advertising message conveys the impression that, unlike traditional tobacco cigarettes, which contain carcinogens, toxins and other impurities and cause disease, CUTTWOOD E-liquids are "without" those things and do not carry that same risk of disease and its e-liquids do not contain DA and/or AP. As demonstrated above in Section II, however, this is materially deceptive, false and misleading given the information revealed by studies that do CUTTWOOD's e-liquids contain DA and AP, but that they also may carry many of the same risks of disease, including COPD, emphysema, Bronchiolitis Obliterans, as traditional tobacco cigarettes, including specific nitrosamines, which

- 28 -

is not disclosed by Defendants. Information regarding the effects of inhaling such substances must be disclosed to ensure that a reasonable consumer is not misled.

64. Defendants' packaging on its e-liquids only discloses the amount of nicotine, propylene glycol and vegetable glycerin. It does not state that its products contain AP and/or DA, nor does it contain a warning regarding the hazardous effects on the human body of inhaling AP and DA. In addition, its e-liquids are fraught with false representations and material omissions, conveys the impression that the product contains no meaningful health risks other than possibly those that are a direct result of nicotine.

65. In addition, Defendants' labels fail to provide a proper Proposition 65 warning. It also omits the full list of ingredients and other carcinogens it contains from the label; thus denying consumers, at the point of sale, the opportunity to decide for themselves whether the chemicals used are substances they are willing to risk inhaling. In addition, Defendants advertise that the substance emitted from its product is harmless "vapor," generated from distilled water contained in the cartridge. However, this is not only misleading but scientifically false because e-Cigarettes are actually emitting aerosol that contains numerous carcinogens, which is nowhere mentioned on labelling or any of its advertisements. Moreover, as discussed below, omitting all of the ingredients on the package conceals the dangers associated with the chemicals in its CUTTWOOD e-liquids, which are described in the studies referenced above. When other tobacco substitutes such as nicotine gum and nicotine patches were invented, little was known about their health effects yet they were highly regulated and actually started out as a prescription drug and were only sold over the counter once enough evidence was acquired of their general safety. Labelling restrictions were then implemented shortly after. Only now has the federal government began deregulating labelling restrictions making them less strict because they have been around for decades so their long term effects are widely known. CUTTWOOD's labels are incomplete and deceptive because

CUTTWOOD knowingly left out key ingredients of their products that can pose significant threats to human health. Companies, like CUTTWOOD, rely on the lack of decisive action of the FDA to regulate labelling regulations of e-juices to justify intentionally misleading their customers into believing that they are consuming a generally safe product.

66.     This is deceptive and misleading, as the advertising, marketing and packaging omit reference to the other carcinogens, toxins and impurities, including carcinogenic tobacco-specific nitrosamines found in E-liquids as discussed above in Section II. It also does not reference the difference in inhalation behavior between vaping and traditional smoking (described herein) that may cause additional problems for persons who use e-liquids, including CUTTWOOD e-liquids. Moreover, by listing health risks related to nicotine, but not cancer, the packaging is further misleading by omission.

67.     As demonstrated below, Defendants' pervasive advertisements representing that its products offer all of the positive aspects of smoking/cigarettes without the negative ones, and otherwise implying that CUTTWOOD's e-liquids are without various health risks, are materially deceptive, false and misleading given the studies discussed above in Section II and fail to disclose that such research and studies have raised significant concerns about the health risks of CUTTWOOD e-liquids, including but not limited to:

- the harmful impact to lung capacity as a result of the chemicals, including DA, AP, and propylene glycol, that are present in Defendants' e-liquids;
- the presence of nitrosamines, toxins, and other impurities, including certain of those found in tobacco cigarettes, that are dangerous to the user's health and cause disease;

- that CUTTWOOD e-liquids require that the user take significantly stronger puffs than the puffs required for a traditional tobacco cigarette, and that this could be harmful to health; and

- other potentially dangerous but unknown health effects caused by the long term use of CUTTWOOD's E-liquids.

## CLASS DEFINITIONS AND ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis.  Plaintiff brings this action on behalf of herself and all members of the following class comprised of: **All persons, exclusive of Defendants and its employees, who purchased one or more CUTTWOOD E-liquids, including e-juices, components thereof, cartridges or accessories therefor, sold by Defendants during the relevant period (the "Class").**

69.     Plaintiff reserves the right to modify or amend the definitions of the Class after he has had an opportunity to conduct discovery.

70.     ***Numerosity. Rule 23(a)(1)*** The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes that the proposed Class contains at least thousands of purchasers of the CUTTWOOD E-liquids who have been damaged by Defendants' conduct as alleged herein.  The number of the Class members is unknown to Plaintiff but can be discerned from the records maintained by Defendants.

71.     ***Existence of Common Questions of Law and Fact. Rule 23(a)(2).*** This action involves common questions of law and fact, which include, but are not limited to, the following:

a.      Whether the statements made by Defendants as part of its advertising for CUTTWOOD E-liquids discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b.  Whether Defendants' conduct described herein constitutes a deceptive act or practice in violation of the CLRA;

c.  Whether Defendants' conduct described herein constitutes an unlawful, unfair, and/or fraudulent business practice in violation of the UCL;

d.  Whether Defendants' conduct described herein constitutes unfair, deceptive, untrue or misleading advertising in violation of the UCL;

e.  Whether Defendants' conduct described herein constitutes unfair, deceptive, untrue or misleading advertising in violation of the FAL;

f.  Whether Defendants' conduct constitutes a breach of express warranty;

g.  Whether Plaintiff and the other members of the Class are entitled to damages; and

h.  Whether Plaintiff and the Class are entitled to injunctive relief, restitution or other equitable relief and/or other relief as may be proper.

72.  *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By purchasing CUTTWOOD E-liquids during the relevant time period, all members of the Class were subjected to the same wrongful conduct. Plaintiff's claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of warranty concern the same business practices described herein irrespective of where they occurred or were experienced.

73.  *Adequacy. Rule 23(a)(4).* Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

74. ***Injunctive and Declaratory Relief. Rule 23(b)(2)***. Defendants' actions regarding the deceptions and omissions regarding CUTTWOOD's e-liquids are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

75. ***Predominance and Superiority of Class Action.*** Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

    a. Absent a class action, members of the Class as a practical matter will be unable to obtain redress, Defendants' violations of its legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain its ill-gotten gains;

    b. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

    c. When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

    d. A class action will permit an orderly and expeditious administration of each Class members' claims and foster economies of time, effort, and expense;

    e. A class action regarding the issues in this case does not create any problems of manageability; and

    f. Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate.

76. Notice to the putative Class may be accomplished through publication, signs or placards at the point-of-sale, or other forms of distribution, if necessary, if the Class is certified or if the Court otherwise determines class notice is required.

Plaintiff will, if notice is so required, confer with Defendants and seek to present the Court with a stipulation and proposed order on the details of a class notice program.

### COUNT I

**Injunctive Relief for Violations of the Consumers Legal Remedies Act**
**(Cal. Civil Code §§ 1750 *et seq.*)**
**(On Behalf of the Plaintiff and the Class and Against Defendants)**

77.     Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

78.     The relevant period for this Count is four years from the date of filing of this Complaint until judgment is entered.

79.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* ("CLRA" or the "Act"), which provides that enumerated listed "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful," CLRA § 1770, and that "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against such person to recover or obtain," various forms of relief, including injunction and damages.   Cal. Civ. Code § 1780.

80.     This cause of action seeks injunctive relief at this time.   On November 23, 2015, prior to the filing of this Complaint, Plaintiff sent Defendants a CLRA notice letter providing the notice required by California Civil Code § 1782(a). Plaintiff sent the letter via certified mail, return receipt requested, to the locations at which Plaintiff purchased some of her CUTTWOOD E-liquids, as well as to Defendants' principal place of business in Cerritos, CA, and to the Secretary of State of California, advising Defendants that it is in violation of the CLRA and must correct, replace or otherwise rectify the goods and/or services alleged to be in violation of § 1770.   Defendants were further advised that in the event the relief

1 requested has not been provided within thirty (30) days, Plaintiff will amend her
2 Complaint to include a request for monetary damages pursuant to the CLRA. A true
3 and correct copy of Plaintiff's letter is attached hereto as Exhibit A. If Defendants
4 do not correct, replace, or otherwise rectify the goods and/or services alleged in
5 either Plaintiff's letter or this Complaint within the statutorily proscribed 30-day
6 period, Plaintiff will amend her Complaint to seek both injunctive relief and
7 monetary damages against Defendants pursuant to the CLRA, California Civil Code
8 §§ 1781 and 1782.

9      81.    Plaintiff was deceived by Defendants' unlawful practices as described
10 more fully above, which included carrying out an advertising campaign, directed at
11 Plaintiff and the Class, conveying the message that CUTTWOOD e-liquids are free
12 of DA and AP, and are known to be generally safe, which were deceptive, false and
13 misleading given the ingredients and characteristics of CUTTWOOD products
14 which were or should be known to Defendant, and the studies that have found
15 carcinogens, toxins, and other potentially harmful impurities in CUTTWOOD E-
16 liquids and electronic cigarettes generally, including certain of those found in
17 traditional tobacco cigarettes, and that CUTTWOOD E-liquids can be used
18 continuously and for longer periods of time than a traditional cigarette, and that this
19 could be harmful to health which was not disclosed.

20      82.    Defendants' actions, representations and conduct have violated, and
21 continue to violate the CLRA, because they extend to transactions that are intended
22 to result, or which have resulted, in the sale of goods to consumers.

23      83.    Defendants marketed, sold and distributed CUTTWOOD E-liquids in
24 California during the relevant period.

25      84.    Plaintiff and members of the Class are "consumers" as that term is
26 defined by the CLRA in Cal. Civ. Code § 1761(d).

27      85.    Defendants' CUTTWOOD E-liquids were and are "good[s]" within the
28 meaning of Cal. Civ. Code §§ 1761(a) & (b).

86. Defendants violated the CLRA by engaging in at least the following practices proscribed by California Civil Code § 1770(a) in transactions with the Plaintiff and the Class which were intended to result, and did result, in the sale of CUTTWOOD E-liquids:

> (5) Representing that [CUTTWOOD E-liquids have] . . . approval, characteristics . . . uses [or] benefits . . . which [they do] not have . . . .
>
> \*\*\*
>
> (7) Representing that [CUTTWOOD E-liquids are] of a particular standard, quality or grade . . . if [they are] of another.
>
> \*\*\*
>
> (9) Advertising goods . . . with intent not to sell them as advertised.

87. As such, Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices because they do not sell, and because they intend not to sell, the CUTTWOOD E-liquids as Defendants advertised and instead misrepresent the particulars by, in its marketing, representing CUTTWOOD E-liquids as a safer, healthier and "smarter" choice than traditional cigarettes, when they knew, or should have known, that the representations and advertisements were deceptive, false and misleading in light of the omissions of material facts as described above.

88. The omitted information would have been material to a reasonable consumer in his or her decision as to whether to purchase the CUTTWOOD E-liquids and/or purchase the CUTTWOOD E-liquids at the price at which they were offered.

89. Defendants had a duty to disclose this information to the Plaintiff and the members of the Class for several reasons. First, Defendants omit the presence of DA and AP, and in the past titanium dioxide in their products. Disclosure of the omitted information, including information in the studies referred to *supra* in Section II, was necessary to avoid the false impression of safety provided by such

marketing. Second, Defendants were in a position to know, from their own product knowledge and creation decisions and the studies, of the presence of carcinogens, toxins, and other impurities in their CUTTWOOD E-liquids, especially as described in the FDA's 2009 study, while consumers were not reasonably in a position to be aware of Defendants' internal product information or such studies. Third, Defendants actively omitted to disclose, or actively concealed, these material facts as to Plaintiff and the Class. Finally, while Defendants made certain specific representation about the risks associated with nicotine, that representation is a misleading half-truth because it implies that is the only risk relating to the product, when, in fact, it is not.

90. Defendants provided Plaintiff and the other Class members with CUTTWOOD e-liquids that did not match the quality portrayed by their marketing.

91. As a result, Plaintiff and members of the Class have suffered irreparable harm. Plaintiff and the other Class members' injuries were proximately caused by Defendants' conduct as alleged herein. Plaintiff, individually and on behalf of all other Class members, seeks entry of an order enjoining Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code section 1780(a)(2), awarding exemplary and punitive damages against Defendants pursuant to California Civil Code sections 1780(a)(1) and (a)(4), and ordering the payment of costs and attorneys' fees, and such other relief as deemed appropriate and proper by the Court under California Civil Code section 1780(a)(2). If Defendants are not restrained from engaging in these practices in the future, Plaintiff and the Class will continue to suffer harm.

92. Pursuant to section 1780(d) of the CLRA, attached hereto as Exhibit B is an affidavit showing that this action has been commenced in the proper forum.

## COUNT II
**Injunctive and Equitable Relief for Violations of Unfair Competition Law
(Cal. Business & Professions Code §§ 17200, *et seq.*)
(On Behalf of the Plaintiff and the Class and Against Defendants)**

93. Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

94. The relevant period for this Count is four years from the filing of this Complaint until judgment is entered.

95. The Unfair Competition Law, Cal. Business & Professions Code § 17200, *et seq.* ("UCL"), prohibits any "unlawful," "unfair," or fraudulent business act or practice and any false or misleading advertising.

96. In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating Cal. Civil Code §§ 1750, *et seq.*

97. Plaintiff, individually and on behalf of the Class members, reserves the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

98. Defendants' actions constitute "unfair" business acts or practices because, as alleged above, *inter alia*, Defendants engage in deceptive and false advertising, and misrepresents and omits material facts regarding its e-liquids and related paraphernalia, and thereby offends an established public policy, and engages in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §§ 17200, *et seq.*

99. Business & Professions Code §§ 17200, *et seq.*, also prohibits any "fraudulent business act or practice."

100. Defendants' actions, claims, nondisclosures, and misleading statements, as alleged herein, also constitute "fraudulent" business practices in

- 38 -

violation of the UCL because, among other things, they are false, misleading, and/or likely to deceive reasonable consumers within the meaning of Business & Professions Code §§ 17200, *et seq.*

101. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

102. As a result of Defendants' pervasive false marketing, including deceptive and misleading acts and omissions as detailed herein, Plaintiff and other members of the Class have in fact been harmed as described above. If Defendants had disclosed the information discussed above about the CUTTWOOD E-liquids and otherwise been truthful about their safety, Plaintiff would not have purchased Defendants' products. Defendants were also able to charge more than what its CUTTWOOD E-liquids would have been worth had it disclosed the truth about them.

103. As a result of Defendants' unlawful, unfair, and fraudulent practices, Plaintiff and the other Class members have suffered injury in fact and lost money.

104. As a result of its deception, Defendants have been able to reap unjust revenue and profit in violation of the UCL.

105. Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate for the Plaintiff and the Class.

106. As a result of Defendants' conduct in violation of the UCL, the Plaintiff and members of the Class have been injured as alleged herein in amounts to be proven at trial because they purchased CUTTWOOD E-liquids without full disclosure of the material facts discussed above.

107. As a result, the Plaintiff, individually, and on behalf of the Class, and the general public, seek restitution and disgorgement of all money obtained from the Plaintiff and the members of the Class collected by Defendants as a result of unlawful, unfair, and/or fraudulent conduct, and seek injunctive relief, and all other

relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT III

### Injunctive Relief and Damages for Violation of the Deceptive, False and Misleading Advertising
### (Cal. Bus. & Prof. Code §§ 17500 *et seq.*)
### (On Behalf of the Plaintiff and the Class and Against Defendant)

108. Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

109. The relevant period for this Count is four years from the filing of this Complaint until judgment is entered.

110. Bus. & Prof. Code § 17500 states:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter, into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminated or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised.

111. To establish a violation of § 17500, Plaintiff must show the following elements: (1) Defendants intended to dispose of personal property; and (2) Defendants publicly disseminated advertising which: (a) contained a statement which was untrue or misleading, and (b) which Defendants knew, or in the exercise of reasonable care should have known, was untrue or misleading, and (3) which concerned the personal property.

112.  Defendants publicly disseminated advertising through public media (i.e., internet, product labels, and packaging) that their brand of e-liquids are safer, healthier alternative to traditional cigarettes.  Defendants, however, failed to disclose material negative facts about their brand of e-liquids which would have materially affected a consumer's decision to use or buy their product.  These misleading advertisements reasonably deceived Plaintiff and the Class to purchase Defendants' brand of e-liquids.

113.  Defendants knew its advertisements are misleading because CUTTWOOD had exclusive control of negotiating, purchasing, inspecting the CUTTWOOD E-liquids and e-liquids before selling them to retailers and consumers. CUTTWOOD cannot stand idly, cover its eyes and ears, and not conduct an investigation as to prevent false advertising.  *People v. Forest E. Olson, Inc.*, 137 Cal.App.3d 137, 139 (1982); *Khan v. Medical Bd.*, 12 Cal.App.4th 1834, 1846 (1993); *Feather River Trailer Sales, Inc. v. Sillas*, 96 Cal.App.3d 234 (1979). CUTTWOOD owes Plaintiff and the Class a duty to exercise reasonable care to prevent the public dissemination of misleading advertisements.  Had Defendants exercised reasonable care, CUTTWOOD could have prevented the public disclosure of misleading advertisements relating to its brand of e-liquids, and therefore could have accurately informed Plaintiff and the Class of their product, so they can make an informed decision on whether to use or purchase CUTTWOOD E-liquids. Because Defendants publicly disseminated advertising of its products which are misleading, Defendants violated § 17500.

114.  Bus & Prof. Code § 17535 authorizes courts to enter injunctive relief against deceptive advertising and to award restitution:

> Any person, corporation, firm, partnership, joint stock company, or any other association, or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any

CLASS ACTION COMPLAINT

practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful. Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public.

115. Plaintiff and the Class are entitled to injunctive relief and therefore request the Court to issue an order enjoining Defendants from continuing to publicly disseminate its misleading advertisements. Plaintiff and the Class are also entitled to a restitutionary award for monies deceptively acquired by Defendants through its misleading advertisements.

116. The damages suffered by Plaintiff and the Class were directly and proximately caused by the unfair and deceptive acts and practices of Defendants, as more fully described herein.

117. Plaintiff and the Class seek a declaratory judgment and a court order enjoining the above-described wrongful acts and practices of Defendants.

118. Additionally, Plaintiff and the Class make claims for damages, attorneys' fees and costs.

<u>**COUNT IV**</u>
**Damages for Breach of Express Warranty**
**(On Behalf of the Plaintiff and the Class and Against Defendants)**

119. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

120. The relevant period for this Count is four years from the filing of this Complaint until judgment is entered.

121. Plaintiff brings this claim individually and on behalf of the Class.

122. Plaintiff, and each member of the Class, formed a contract with Defendants at the time Plaintiff and the other members of the Class purchased CUTTWOOD E-liquids or related paraphernalia. The terms of that contract include the promises, affirmations and guarantees made by Defendants on its CUTTWOOD

- 42 -

1 E-liquids packaging and labeling and through the CUTTWOOD marketing
2 campaign, as described above. This product packaging, labeling, and advertising
3 constitute express warranties, became part of the basis of the bargain, and are part of
4 a standardized contract between Plaintiff and the members of the Class on the one
5 hand, and Defendants on the other.

6      123. Plaintiff and the members of the Class performed their obligations
7 under the contract.

8      124. Defendants breached the terms of this contract, including the express
9 warranties, with Plaintiff and the Class by not providing CUTTWOOD e-liquids that
10 offered a product free of DA, AP (or similar variations), and/or titanium dioxide, a
11 safe and healthy alternative to smoking traditional cigarettes, and otherwise omitted
12 material information about potential health and safety risks associated with the
13 product. Such express warranties breached by Defendants include the CUTTWOOD
14 e-liquids representations set forth above.

15      125. As a result of Defendants' breach of its contract, Plaintiff and the Class
16 have been damaged in the amount of the purchase price of the CUTTWOOD e-
17 liquids and related paraphernalia they purchased.

18 **PRAYER FOR RELIEF**
19 Wherefore, Plaintiff prays for a judgment:

20     a.     Certifying the Class as requested herein, appointing Plaintiff as class
21           representative for the Class, and appointing Plaintiff's attorneys as
22           counsel for the Class;

23     b.     Requiring Defendants to disgorge or return all monies, revenues and
24           profits obtained by means of any wrongful act or practice to Plaintiff
25           and the members of the Class under Cal. Bus. & Prof. Code §§ 17200
26           *et seq*, and each other cause of action where such relief is permitted;

27     c.     Enjoining Defendants from continuing the unlawful practices as set
28           forth herein, including marketing or selling CUTTWOOD E-liquids

CLASS ACTION COMPLAINT

without disclosing the potential health and safety risks relating thereto, and directing Defendants to engage in corrective action, or providing other injunctive or equitable relief;

d.   Awarding exemplary and punitive damages pursuant to Cal. Civ. Code § 1780 to prevent and deter Defendants from future unlawful conduct;

e.   Awarding damages for breach of express warranty to each member of the Class;

f.   Awarding all equitable remedies available pursuant to Cal. Civ. Code § 1780 and other applicable law;

g.   Awarding attorneys' fees and costs;

h.   Awarding pre-judgment and post-judgment interest at the legal rate; and

i.   Providing such further relief as may be just and proper.

DATED: November 23, 2015                    **BISNAR | CHASE LLP**

By:   *s/ Jerusalem F. Beligan*
BRIAN D. CHASE
JERUSALEM F. BELIGAN

By:   *s/ Jose Garay*
JOSE GARAY
*Counsel for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: November 23, 2015

**BISNAR | CHASE LLP**

By:  *s/ Jerusalem F. Beligan*
     BRIAN D. CHASE
     JERUSALEM F. BELIGAN

**JOSE GARAY, APLC**

By:  *s/ Jose Garay*
     JOSE GARAY
     *Counsel for Plaintiff*